---

### HEBBELL v. PIONEER PAPER CO.

(Supreme Court, Appellate Division, Third Department. November 15, 1911.)

1. MASTER AND SERVANT (§ 286*)—INJURIES TO SERVANT—ACTIONS—GUARDING MACHINERY—QUESTION FOR JURY.

Whether a master was negligent in failing to guard a belt, pursuant to Labor Law (Consol. Laws 1909, c. 31) § 81, and hence liable for the death of a servant coming in contact with the belt fastenings, *held*, under the evidence, for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1028; Dec. Dig. § 286.*]

2. MASTER AND SERVANT (§ 289*)—INJURIES TO SERVANT—ACTIONS—QUESTIONS FOR JURY.

Whether a servant, employed in a paper mill, acted outside of his duties at the time he was killed by coming in contact with unguarded belt fastenings, *held*, under the evidence, for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1094; Dec. Dig. § 289.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Trial Term, Saratoga County.

Action by Elizabeth Hebbell, as administratrix, against the Pioneer Paper Company. From a judgment of nonsuit and for costs, plaintiff appeals. Reversed, and new trial granted.

This is an action by a personal representative to recover damages for the death of her husband. Plaintiff's intestate had worked for defendant in its paper mill for some eight years, most of this time as general helper about the mill machinery, but at the time of his death and for two weeks prior thereto as machine tender. In the process of manufacturing paper, the raw material passes into beaters, where it is ground or cut up, and from thence down to what is known as the "beater room chest" under the floor of the beater room. From this chest extends a box or spout to a pump, which forces the stock to another beating machine, called the "Jordan," from which the stock finally reaches the particular machine which was in charge of deceased at the time of the accident. The beater chest spout leading to the pump contains a gate about a foot square, which cannot be raised by hand, but is raised or lowered by means of an iron bar. When the gate is down, the stock cannot flow to the pump. The beater chest spout and the pump are situated in a pit, some 8 or 10 feet deep, under the floor of the beater room, and access to the pit is through a small hole in the floor of the beater room, which hole is always open. The workmen enter the pit by letting themselves down through the floor to a certain wall some 2½ feet from the chest. Across the spout run two pipes horizontally, the lower one about 4 feet from the bottom of the pit, and the other one about a foot higher. The pit is some 12 feet wide by 30 or 40 feet long. Running through or across it at one point directly over the spout gate is the main belt of the mill, 24 inches wide, and fastened together with plates, from which bolts or fastenings project about one-quarter inch. The belt in motion makes some noise, but this is not especially noticeable when the machinery above is running. Deceased had been in this pit prior to the accident, and others had been there on different occasions. The pump had formerly been located on the floor above, but had been placed in the pit about six months before the accident.

On February 6, 1911, the day of the accident, the pump had stopped, and one Huber, the man in charge of the beater room, had spent several hours with two helpers in the pit working over the pump. Between 8 and 9 o'clock that night deceased, observing that the stock for his machine was very low, came into the beater room and asked Huber what was the matter with the pump, to which Huber replied that the pump was all right, but that the spout was clogged. Deceased tried to start the pump, but could not, and then asked Huber if he was sure the gate was up. Huber assured him that it was, but deceased said, "Let's go down, and be sure it is up." Thereupon both of them went down; Huber taking a hand lamp. At this time there was about 2½ feet of paper stock and water on the center of the floor of the pit, and the gate was 12 or 18 inches under water. It seems that the floor of the pit was frequently or usually wet, especially in the hollow center although it does not appear what was the usual depth of the water. Deceased was on the lower pipe mentioned, whether standing upon or leaning over it does not clearly appear from the testimony. He had just reached his arm down under the water and found out and told Huber that the gate was up, and Huber had taken up the lamp and begun to return, when he heard deceased fall, and found him lying partly in the water of the pit, his skull having been fractured by coming in contact with the belt fastenings, as evidenced by blood and hair on the belt bolts, and he died the day following. Deceased was about 5 feet 10 inches tall, and the lower pipe was about 5 feet 6 inches from the belt.

Notice was served upon defendant under the provision of Labor Law, § 201.

Argued before SMITH, P. J., and KELLOGG, HOUGHTON, SEWELL, and BETTS, JJ.

Butler & Kilmer, for appellant.
Rockwood, McKnight & McKelvey, for respondent.

SMITH, P. J. [1] Appellant's principal contention herein is that the accident in question was the result of defendant's negligence in failing properly to guard this belt, pursuant to section 81 of the labor law. On the other hand, respondent claims that the belt was so high above the floor of the pit that it could not reasonably be expected to be a source of danger, and that therefore section 81 does not apply, citing Dillon v. National Coal Tar Co., 181 N. Y. 215, 73 N. E. 978, and Wynkoop v. Ludlow Valve Co., 196 N. Y. 324, 89 N. E. 324, 30 L. R. A. (N. S.) 36. We think, however, that the principles laid down in these cases do not apply to the facts of the case at bar   This pit, especially since the placing of the stock pump there, was clearly a place wherein employés at least occasionally had to be to look after the mill machinery and appliances under their charge. If the floor of the pit had been dry, and convenient access thereto had been provided, a different situation would be presented. Upon such a state of facts the possibility of one coming in contact with the belt by standing on the pipe above the spout might be, under the authorities, too remote to require the guarding of the belt. But such was not the situation as disclosed by the evidence. With over 2 feet of water and paper stock covering the pit floor, where the gate was, so that the gate itself was under water, it cannot be held negligence as matter of law for employés to try to keep off the pit floor, even if they had to step or support themselves on this pipe above, or spout. Nor do we think the defendant is excused in this respect, as matter of law, by some evidence in the case that it had provided rubber boots for use in this pit and ladders for going down. There is no evidence that the use of the ladder would have obviated the necessity or convenience of getting on the pipe to open the gate, and the evidence is at least uncertain as to whether there were any boots at hand at the time; the man in charge of the beater room saying that he did not know, but did not think the boots were there. But, whatever may have been the fact, it was apparently not the custom to use them. We accordingly think it was a question of fact for the jury as to whether, under all the circumstances, defendant was negligent in failing to guard this belt.

[2] Respondent further claims that deceased was a mere volunteer at the time of his death; that he was a machine tender only, and consequently had no business in the pit at this time. There is no evidence in the case exactly defining the duties of deceased; but the evidence as to what he actually did shows clearly that even subsequent to the time he became machine tender he did other work about the mill in connection with repairs. Furthermore, it appeared to be customary for him, if there was trouble in the beater room and his stock was getting low, so that he would have to shut his machine down, to go to the beater room to help locate the trouble. On all such occasions, and particularly at the time of the accident, in view of the fact that his machine was dependent for its supply of material upon the product of the beater room, and that a shut-down there would result in his machine running out of material, we think it cannot be said as matter of law that he was acting outside of his duties, especially when

it is considered that he had for years acted as a general helper about the machinery, and so must have been more or less familiar with it all.

Judgment of nonsuit and for costs reversed, and a new trial granted, with costs to abide the event.

Judgment reversed, and new trial granted, with costs to appellant to abide event. All concur.